IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN A. SALDANO, et al., | CASE NO. CV F 01-5462 LJO |
| Plaintiffs, | **TRIAL DECISION** |
| vs. | |
| UNITED STATES OF AMERICA; UNITED STATES DEPARTMENT OF THE INTERIOR, NATIONAL PARK SERVICE; AND SUPERINTENDENT YOSEMITE NATIONAL PARK, | |
| Defendants. | |

**INTRODUCTION**

This Court conducted a September 14, 17 and 18, 2007 court trial in this action brought under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671-2680, to determine the bifurcated liability issue whether the federal defendants[1] set a safe speed limit on a Yosemite National Park ("Yosemite") road where plaintiffs John A. Soldano ("Mr. Soldano") and his wife Denise Soldano ("Mrs. Soldano") collided their motorcycle with an oncoming van. Mr. and Mrs. Soldano appeared by counsel Federico Castelan Sayre and James F. Rumm, Law Offices of Federico Castelan Sayre. The Government appeared by Assistant U.S. Attorney Brain Enos. After consideration of the evidence and argument, this Court FINDS and CONCLUDES that the Government was not negligent in setting the road's speed limit.

---

[1] Remaining defendants are the United States of America, United States Department of the Interior, National Park Service, and Superintendent Yosemite Park and will be referred to collectively as the "Government."

1

**FACTUAL FINDINGS**

**The Collision**

On June 23, 1998 at approximately 11:30 a.m., Mr. Soldano drove his classic front-end Harley-Davidson motorcycle at 30 mph[2] westbound on Yosemite's two-lane Big Oak Flat Road ("road"). Mr. Soldano was familiar with the road having made perhaps 30 prior trips on it. Mrs. Soldano was a passenger riding behind Mr. Soldano.

Mr. and Mrs. Soldano traveled around a bend in the road approaching Cascade Creek Bridge with solid granite to their right and little shoulder. Mr. and Mrs. Soldano were startled to observe M. Annette Wang's van ("Wang van") stopped in their lane. The Wang van waited to turn left across the road's solid double yellow lines to enter the Cascade Bridge vista point ("vista point") adjacent to the road. As they approached the Wang van, Mr. and Mrs. Soldano also observed a vehicle ("vista point vehicle") stopped in the vista point and prepared to turn onto the road. Mr. Soldano braked hard but released the brakes in fear of losing control of the motorcycle. To avoid the Wang van, Mr. Soldano crossed the solid double yellow lines, swerved into the oncoming traffic lane, and collided into Stephen Anthony Chin's oncoming van ("Chin van"). As a result of the head-on collision with the Chin van, Mr. Soldano suffered severe injuries to render him paraplegic. Mr. Soldano was cited for improper crossing of solid double yellow lines.

**The Road And Stopping Sight Standards**

The road was constructed during 1937-1940 and has been neither redesigned nor reconstructed since its original construction. The road is two lanes with 11-foot wide lanes and a northwest to southwest orientation. The road is a principal traffic route in and out of Yosemite and is heavily traveled during the summer tourist season.

The U.S. Department of Interior, National Park Service ("Park Service") prepared 1968 and 1984 Park Road Standards ("park road standards") to establish policies for design and construction for national parks' roads. The 1984 park road standards include Table 6 "Stopping Sight Distance (Wet Pavements)." Table 6 defines sight distance as the "length of roadway on which another vehicle or

---

[2] This Court's finding that Mr. Soldano drove at a speed of 30 mph renders irrelevant that the road was sign posted with a 35 mph speed limit.

obstruction is continuously visible to the driver." Table 6 further notes: "Stopping sight distance used for road design is the sum of two distances: (1) the distance a vehicle travels after the driver sights an immobile vehicle or object in the roadway and before braking occurs; and (2) the distance traveled during braking." Table 6 specifies for a road with a 35 mph speed limit a 225-foot minimum stopping-sight distance and a 250-foot desirable stopping-sight distance. Table 6 specifies for a road with a 30 mph speed limit a 200-foot minimum and desirable stopping-sight distance. Table 6 specifies for a road with a 25 mph speed limit a 150-foot minimum and desirable stopping-sight distance.

### Expert Opinions

Mr. and Mrs. Soldano's accident reconstruction expert Ted Kobayashi ("Mr. Kobayashi") opined that Mr. and Mrs. Soldano's collision resulted from limited stopping-sight distance near the collision site to require a maximum stopping-sight distance. Mr. Kobayashi testified:

Q. If you want to keep a left-turning location for the turnout, and you don't want to do major reconstruction, is the solution then to reduce the speed to 25 miles per hour?

A. The solution is to reduce the speed to 25 miles per hour, but you also have to tell the operator that why you are reducing it to 25 miles per hour. And that's because there is – there are a possibility of a vehicle slowing or stopping in that area. . . .

Q. So the combination?

A. That's correct. Because it's a combination of both the roadway itself, and the action of the driver to turn into the turnout area that's causing the problem. It's not only the geometry of the roadway.

Mr. and Mrs. Soldano's traffic engineer expert Ron Shields ("Mr. Shields") opined that 25 mph, not 35 mph, is a safe speed for the portion of road of Mr. and Mrs. Soldano's collision based on a 175-180-foot stopping-sight distance approaching the vista point turn out. Mr. Shields testified:

Q. What sort of things do you as a traffic engineer or would you do as a traffic engineer to try to control the speed at this location?

A. First thing to look at, is it an unusual condition, and that would be the first thing

|   |   |   |
|---|---|---|
| 1 | | I would look at here, because it's – the turnout is at the end of a curve where the |
| 2 | | line of sight is not really adequate. |
| 3 | | So I would like to warn the people prior to them getting there or not allow |
| 4 | | people to turn into that lookout from this direction of travel. |
| 5 | Q. | Okay. So in other words, you would somehow prevent people from making a left |
| 6 | | turn where the Wang vehicle was attempting to make the left turn? |
| 7 | A. | That would be one alternative. |
| 8 | | . . . |
| 9 | Q. | You said a warning sign. What kind of warning sign? |
| 10 | A. | I would want to warn the recommended speed as well as there is vehicles turning, |
| 11 | | that they would not be aware of otherwise. |
| 12 | Q. | So watch out for stopping or slowing vehicles? |
| 13 | A. | Yes. |

The Government's accident reconstruction expert Rene Castaneda ("Mr. Castaneda") opined that had Mr. Soldano been attentive in operation of his motorcycle, he could have perceived the stopped Wang van in his path approximately 175 feet behind it. Mr. Castaneda further opined that had Mr. Soldano responded to the stopped Wang van with a normal perception-decision-reaction ("PDR") time of 1.5 seconds, Mr. Soldano could have stopped his motorcycle from a speed of 30 mph at a location 64-69 feet behind the Wang van to avoid the collision.

The Government's traffic engineer expert Ed Ruzak ("Mr. Ruzak") opined that the park road standards are guidelines and mandate no changes to the road. Mr. Ruzak further opined that based on the road's design and characteristics, its 35 mph speed limit was reasonable and that drivers would not adhere to reduction less than 30 mph because "the geometrics allowed them to go comfortably faster through a lot of the sections and they wouldn't adhere to that slow speed."

## **LEGAL DISCUSSION AND CONCLUSIONS**

### **Bifurcated Liability Issue**

As a reminder, this Court's November 17, 2003 decision granted the Government summary judgment on Mr. and Mrs. Soldano's claims that the Government caused or contributed to the collision

by improper design of the road and adjacent area and failure to properly maintain the road and adjacent area and to post adequate warning signs. The Ninth Circuit Court of Appeals affirmed summary judgment in part but determined that "the government's purported failure to set a safe speed limit on the Road remains a triable issue that is not precluded by the discretionary function exception" to FTCA's waiver of sovereign immunity.[3] As such, using the opening comments of Mr. and Mrs. Soldano's counsel, the bifurcated liability issue "for the Court is the determination, solely and exclusively about whether or not the speed limit of 35 miles per hour under the facts and circumstances of the case, the situation, was an unsafe speed."

## Governing Law

A district court applies the substantive law of the state where the negligent act or omission occurred in an FTCA action. *See Richards v. United States*, 369 U.S. 1, 11, 82 S.Ct. 585 (1962). "The extent of the government's [FTCA] liability is a matter of federal law (28 U.S.C. §§ 1346(b), 2674), albeit determined according to state standards." *Taylor v. United States*, 821 F.2d 1428, 1433 (9th Cir. 1987), *cert. denied*, 485 U.S. 992, 108 S.Ct. 1300 (1988). As such, California law governs whether the Government was negligent to set a 35 mph speed limit.

## Negligence

The negligence elements which a plaintiff must prove are: (1) legal duty of care owed to plaintiff; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from breach of the duty of care. *See Hanson v. Grode*, 76 Cal.App.4th 601, 606, 90 Cal.Rptr.2d 396 (1999); *see also Burgess v. Superior Court*, 2

---

[3] An action can be brought against the United States only to the extent that the federal government waives its sovereign immunity. *Blackburn v. United States*, 100 F.3d 1426, 1429 (9th Cir. 1996); *Valdez v. United States*, 56 F.3d 1177, 1179 (9th Cir. 1995). The FTCA waives the federal government's sovereign immunity when its employees are negligent within the scope of their employment. *Faber v. United States*, 56 F.3d 1122, 1124 (9th Cir. 1995).

FTCA's immunity waiver is limited by the discretionary function exception, which bars claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The discretionary function exception "restores the government's immunity in situations where its employees are carrying out governmental or 'regulatory' duties." *Faber*, 56 F.3d at 1124. "The purpose of the discretionary function exception is to protect the ability of the government to proceed with decisionmaking in carrying out its unique and vital functions without 'second-guessing' by the courts as to the appropriateness of its policy choices." H.R. Rep. No. 1015, 101st Cong. 2nd. Sess. 134 (1991).

Cal.4th 1064, 1072, 9 Cal.Rptr.2d 615 (1992).

### *Standard Of Care*

Mr. and Mrs. Soldano contend that Table 6 of the 1984 park road standards sets the standard of care for the road's minimum stopping-sight distance and in turn its speed limit. As such, Mr. and Mrs. Soldano argue that in the absence of a 225-foot minimum stopping sight-distance approaching the collision site, the Government breached its duty of care by setting an excessive fast 35 mph speed limit. Mr. and Mrs. Soldano favor a 25 mph speed limit.

This Court disagrees with Mr. and Mrs. Soldano that the park road standards establish the Government's standard of care to set speed limits. Mr. and Mrs. Soldano point to no legal authority to establish that the park road standards set the standard of care. This Court agrees with Mr. Ruzak that the park road standards are guidelines, not mandates. Among the expert opinions, there is no dispute that the minimum stopping sight-distances set by the park road standards are based on a worst case scenario, which was not present here in that driving conditions were near ideal. As guidelines, the park standards are relevant but not commandments to set the Government's standard of care.

The Government's applicable standard of care is "to use ordinary care to prevent others being injured as the result of their conduct." *Rowland v. Christian*, 69 Cal.2d 108, 112, 70 Cal.Rptr. 97 (1968); *Hilyar v. Union Ice Co.*, 45 Cal.2d 30, 36, 286 P.2d 21 (1955); *Warner v. Santa Catalina Island Co.*, 44 Cal.2d 310, 317, 282 P.2d 12 (1955). This Court adopts Mr. Ruzak's reasoning that given the road's design and characteristics, the 35 mph speed limit was reasonable. The Government met the standard to use ordinary care and breached no duty of care to Mr. and Mrs. Soldano, especially given Mr. Ruzak's conclusion that the road's 35 mph speed limit (5 mph higher than Mr. and Mrs. Soldano's speed) was reasonable.

### *Causation*

To demonstrate causation, a "plaintiff must show that the defendant's act or omission was a 'substantial factor' in bringing about the injury." *Saelzler v. Advanced Group 400*, 25 Cal.4th 763, 774,107 Cal.Rptr.2d 617 (2001); *Ambriz v. Kelegian*, 146 Cal.App.4th 1519, 1535, 53 Cal.Rptr.3d 700 (2007). "[The] actor's negligent conduct is not a substantial factor in bringing about harm . . . if the harm would have been sustained even if the actor had not been negligent." *Viner v. Sweet*, 30 Cal.4th

6

1232, 1240, 135 Cal.Rptr.2d 629 (2003); *Ambriz*, 146 Cal.App.4th at 1535-1536, 53 Cal.Rptr.3d 700.

Proof of causation cannot be based on speculation and conjecture, and evidence establishing a mere possibility of causation is insufficient. *Saelzler*, 25 Cal.4th at 775-776, 107 Cal.Rptr.2d 617; *Ambriz*, 146 Cal.App.4th at 1537, 53 Cal.Rptr.3d 700. To establish causation, a plaintiff must demonstrate some substantial link or nexus between the alleged omission and the plaintiff's injury. *Saelzler*, 25 Cal.4th at 778, 107 Cal.Rptr.2d 617; *Ambriz*, 146 Cal.App.4th at 1537.

The evidence does not establish that the Government's 35 mph speed limit was a substantial factor to cause Mr. and Mrs. Soldano's injuries. This Court agrees with Mr. Castaneda that had Mr. Soldano been attentive, he could have seen the stopped Wang van in is path for approximately 175 feet behind the van. This Court further agrees with Mr. Castaneda that had Mr. Soldano responded to the stopped Wang van with a normal PDR time of 1.5 seconds, Mr. Soldano could have stopped well short of the Wang van from a 30 mph speed. This Court adopts a 1.5 second PDR time, rather than a 2.5 second PDR suggested by Mr. and Mrs. Soldano, given the absence of evidence that Mr. Soldano was inattentive. This Court accepts Mr. Soldano's testimony that he was not under the influence of alcohol or medication at the time of the collision.

Mr. and Mrs. Soldano claim that the stopped vista point vehicle constituted an additional peril to support a lower speed limit given the stopping-sight distance in the area approaching the collision site. This Court concludes that the evidence does not establish that the vista point vehicle was a substantial factor to bring about Mr. and Mrs. Soldano's injuries. This Court rejects Mr. Shields' testimony that the vista point created an intersection effect and adopts Mr. Ruzak's contrary opinion. This Court notes that vista point traffic could not drive across or through the road and was limited to turn on to it. At most, the vista point created a T-section. The vista point is not such a hazard to impact minimum stopping-sight distances to decrease the speed limit.

Moreover, Mr. Kobayashi and Mr. Shields' opinions distract from Mr. and Mrs. Soldano's claim that the 35 mph speed limit was negligently set. Mr. Kobayashi recommended a 25 mph speed limit **and** signage of an upcoming vehicle slowing or stopping. Mr. Shields agreed and added an option to prevent turning left across the solid double-yellow lines into the vista point. However, the Ninth Circuit concluded that although Mr. and Mrs. Soldano had raised triable issues regarding warning signs, "the

7

discretionary function exception bars the Soldanos' claim that the Park Service negligently designed the Road without warning signs at the site of the accident." As a result, Mr. Kobayashi and Mr. Shields' signage opinions are inconsequential given that signage is subject to discretionary function for which the Government is not liable.

The Government was not negligent to set a 35 mph speed limit in the area approaching the collision site.

### **Imminent Peril**

Mr. and Mrs. Soldano argue that the conditions preceding the collision placed Mr. Soldano in imminent peril to support Mr. Soldano crossing the solid double-yellow lines into the oncoming Chin van. Mr. and Mrs. Soldano point to California BAJI No. 4.40 (Duty of One in Imminent Peril):

> A person who, without negligence on his part, is suddenly and unexpectedly confronted with peril arising from either the actual presence of, or the appearance of, imminent danger to himself or others, is neither expected nor required to use the same judgment and prudence that is required in the exercise of ordinary care in calmer and more deliberate moments. His duty is to exercise the care that an ordinary prudent person would exercise in the same situation. If at that moment he does what appears to him to be the best thing to do, and if his choice and manner of action are the same as might have been followed by an ordinary prudent person under the same conditions, he does all the law requires of him. This is true, even though in the light of later events, it should appear that a different course would have been better and safer.

Mr. and Mrs. Soldano further rely on California BAJI No. 4.41 (Responsibility of One Causing the Perilous Situation):

> When a situation of peril such as that just described [BAJI 4.40] is caused by someone's negligence, and the person in peril, acting under the impulse of fear, makes an instinctive effort to escape and in so doing, injures himself or a third person, the negligence that caused the peril is deemed to be a cause of the injury. This is true even though it might have appeared, or after the event it may appear, from the viewpoint of another person, that the effort to escape was unwise or that the person in danger would not have been injured if that effort had not been made or had been made differently.

Even considering the stopped Wang van as an imminent peril, the evidence reveals that Mr. Soldano had a stopping-sight distance of no less than 175 feet. As such, no person exercising ordinary care under the circumstances would have crossed double-yellow lines given perilous possible scenarios of colliding with: (1) an oncoming vehicle (Chin van) head on approaching in the other lane; (2) with the Wang vehicle as it turned left into the vista point; or (3) the vista point vehicle as it turned onto the road. Mr. Castaneda's testimony reveals that Mr. Soldano could have stopped short of the Wang van.

This Court concludes that had Mr. Soldano continued to brake gradually, his worst fate would have been a low impact rear end collision with the Wang van. Under the circumstances Mr. Soldano faced, increased stopping-sight distance or a slower speed would have provided Mr. Soldano only more time to consider his choices. This Court concludes that Mr. Soldano unreasonably crossed the solid double-yellow lines and swerved into oncoming traffic and did not exercise reasonable care even if the conditions are considered an imminent peril.

**CONCLUSION AND ORDER**

For the reasons discussed above, this Court FINDS and CONCLUDES that the Government was not negligent to set a 35 mph speed limit in the area preceding Mr. and Mrs. Soldano's collision site and certainly would not have been negligent in setting a speed limit of 30 mph, the speed which this Court finds that Mr. and Mrs. Soldano traveled as they rounded the curve approaching the collision site. This Court DIRECTS the clerk to enter judgment in favor of defendants United States of America, United States Department of the Interior, National Park Service, and Superintendent Yosemite National Park and against plaintiffs John A. Soldano and Denise Soldano.

IT IS SO ORDERED.

**Dated:** **September 20, 2007**            **/s/ Lawrence J. O'Neill**
                                                             UNITED STATES DISTRICT JUDGE